IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH - CENTRAL DIVISION

| | |
|---|---|
| TFG-NORTH CAROLINA, L.P., a Utah limited partnership,<br><br>        Plaintiff,<br>v.<br><br>PERFORMANCE FIBERS, INC., a Delaware corporation, and PERFORMANCE FIBERS HOLDINGS, INC., a Delaware corporation,<br><br>        Defendants.<br><br>PERFORMANCE FIBERS, INC., a Delaware corporation, and PERFORMANCE FIBERS HOLDINGS, INC., a Delaware corporation,<br><br>        Counterclaim-plaintiffs<br>v.<br><br>TFG-NORTH CAROLINA, L.P., a Utah limited partnership, TFG HOLDINGS, INC., a Utah corporation, and TETRA FINANCIAL GROUP, LLC, a Utah limited liability company,<br><br>        Counterclaim-defendants. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Case No. 2:08-CV-942<br><br>Judge Tena Campbell<br><br>Magistrate Judge David Nuffer |

## **INTRODUCTION**

This diversity lawsuit arises out of a business transaction between Plaintiff/Counterclaim-Defendant TFG-North Carolina, L.P. (TFG) and Defendant/Counterclaim-Plaintiff Performance Fibers Inc. (Performance Fibers) and parties related to both. TFG filed a complaint asserting that Performance Fibers breached the agreements between them; Performance Fibers asserted a number of affirmative defenses and a counterclaim alleging that TFG was the party in breach.

Following a bench trial, the court reviewed the trial transcript, the exhibits received into evidence and the parties' proposed findings of fact and conclusions of law. The court concludes, as discussed below, that Performance Fibers breached the agreements and is liable to TFG. The court further concludes that Performance Fibers is not entitled to recover from TFG on any of its theories of liability.

## FINDINGS OF FACT

### The Parties

TFG is a Utah limited liability partnership with its principal place of business in Salt Lake County, Utah. Counterclaim-Defendant Tetra Financial Group, LLC, a Utah limited liability company, is a limited partner in TFG. Counterclaim-Defendant TFG Holdings, Inc., a Utah corporation, is the general partner of TFG.[1] TFG is an equipment leasing company.

Performance Fibers is a Delaware corporation located in Richmond, Virginia. Defendant/Counterclaim-Plaintiff Performance Fibers Holdings, Inc. is also a Delaware corporation located in Richmond, Virginia. Performance Fibers Holdings is the corporate parent of Performance Fibers. Performance Fibers is a manufacturer of high-tenacity polyester fibers and fabrics used in tire reinforcements and other woven fabrics. Sun Capital Partners (Sun Capital) is a private equity firm. Sun Capital owns approximately 90% of Performance Fibers and holds two of the three seats on Performance Fibers' board of directors.

---

[1] TFG is the party to the lease with Performance Fibers. Tetra and TFG-Holdings were brought into the case through Performance Fibers' claims. The court will use the abbreviation "TFG" for each of the three entities unless otherwise indicated.

**Performance Fibers' Software**

Until December 2004, Performance Fibers was a separate division of Honeywell International (Honeywell). At that time, Honeywell spun off Performance Fibers and Sun Capital purchased Performance Fibers. Honeywell, including the Performance Fibers unit, had used a suite of enterprise application software programs manufactured by SAP. SAP software is designed to perform a company's accounting, manufacturing, sales, and other functions, including financial reporting, order processing, procurement, and account receivables. As part of the spin-off agreement, Honeywell allowed Performance Fibers to use Honeywell's SAP system for one year. After the one-year agreement with Honeywell ended, Performance Fibers chose to continue using SAP software and implement its own version of the SAP software.

Performance Fibers did not purchase SAP software but instead licensed the software directly from SAP. Performance Fibers paid approximately $780,000 to SAP for the software license. In March 2005, Performance Fibers hired Adjoined Consulting (Adjoined) to implement Performance Fibers' version of the SAP software. Performance Fibers paid Adjoined $3,215,018.05 for Adjoined's services. Adjoined completed the SAP implementation work in March 2006, approximately five months before TFG and Performance Fibers entered into the transaction that is the basis for this lawsuit.

**Performance Fibers Seeks Financing**

Performance Fibers began efforts to borrow money to cover the expense of its implementation of the SAP software program and other expenditures. Thomas Gebbia, Performance Fibers' chief financial officer at the time, instructed Performance Fibers' global treasury manager, David Field, to explore financing options.

Sun Capital recommended that Mr. Field contact Scott Wingate, a leasing broker, to help Performance Fibers obtain financing. In late 2005, Mr. Wingate contacted Trey Turley, a sales associate with TFG, about financing for Performance Fibers. Mr. Turley's job at TFG was to work with equipment leasing brokers. At Mr. Turley's request, Mr. Field sent him financial information, including certain unaudited financial statements. Mr. Turley reviewed the information and then sent it to his supervisor, Ryan Seacrist.

Mr. Seacrist reviewed the information and then gave it to the executive vice-president of TFG, Scott Scharman. Mr. Scharman was the person who, in his own words, "was essentially running the day-to-day operations" of TFG. (Jan. 26 Tr. at 434.) Mr. Seacrist wanted Mr. Scharman to "[m]ake an evaluation and determine under what structure or terms and conditions [TFG] would like to move forward with [Performance Fibers] in a transaction." (Id. at 435.) After analyzing Performance Fibers' information, Mr. Scharman concluded that a transaction with Performance Fibers was possible if structured as a twenty-four-month finance lease with a security deposit for additional collateral. At Mr. Seacrist's direction, Mr. Turley prepared a draft letter of intent, which he sent to Mr. Fields on November 9, 2005. (Ex. 101.)

**The Transaction**

The Letter of Intent

The parties exchanged two draft letters of intent. (Exs. 101, 102.) Mr. Field signed the final letter of intent sometime in January 2006. (Ex. 2.) The letter of intent identified TFG as the lessor and Performance Fibers as the lessee. The leased property was described as "SAP implementation cost – Other possible hard cost." (Id. at 1.) Three possibilities were given as "End of Term Options" -- "At the end of the Base Lease Term, Lessee shall have the

following[:] i) Purchase the Items of Equipment for a price that is agreed upon by both the Lessor and Lessee; or ii) Extend the Lease; or iii) Return the equipment to Lessor." (Id. at 2.)

TFG Obtains Funds for the Transaction

After Mr. Field signed the letter of intent and returned it to TFG, Mr. Turley gathered additional financial information about Performance Fibers to give to Jordan Greenwell, TFG's director of credit and syndication. Mr. Greenwell concluded that the transaction, as structured, was credit-worthy and submitted Performance Fibers' information and a summary of the proposed transaction to Republic Bank, a local commercial bank.

Republic Bank agreed to provide the money for the transaction. Bank officials prepared a document, the Sale and Assignment Agreement, outlining the terms of the agreement. (Ex. I-1.) In this document, TFG agreed to sell all of its interest in "the Property" ("Implementation costs associate[d] with SAP Software") and assign to Republic Bank all of TFG's interest in the Performance Fibers lease and the payments that Performance Fibers was obligated to make. (Id.) Republic Bank agreed to pay TFG $3,476,778.52. (Id.)

The Lease Documents

On April 21, 2006, TFG forwarded draft lease documents to Mr. Field. On June 9, Performance Fibers gave TFG comments, including requested changes from Performance Fibers' legal counsel, the law firm Morgan, Lewis & Bockius (Morgan Lewis). One of the changes requested by Morgan Lewis was to Paragraph 19(d) of the Master Lease, which contained the three end-of-term options from the letter of intent. Morgan Lewis asked that the option to return the leased property be removed but did not ask that the other two end-of-term options -- the option to extend the lease or the option to purchase the property -- be changed or

5

removed. A few days later, TFG responded that it was reviewing Morgan Lewis's requested changes and told Mr. Field that any proposed changes would be put in the Lease Schedule.

On July 5, 2006, TFG sent the revised drafts (the "July 5 Drafts") to Performance Fibers. The July 5 Drafts had some, but not all, of the changes that Morgan Lewis requested. TFG accepted Morgan Lewis's change to the end-of-term provision. TFG also agreed to Morgan Lewis's request that the term "property" be substituted for "equipment" throughout the lease. Mr. Field immediately forwarded these documents to Morgan Lewis and Mr. Wingate for their comment.

On July 17, 2006, Mr. Wingate contacted TFG and told TFG that he had spoken with Mr. Field and Morgan Lewis earlier that day. Morgan Lewis was concerned that certain issues previously raised had not been addressed. Mr. Wingate suggested that one paragraph be added to the Lease Schedule stating that eight specific Master Lease provisions would not apply to this transaction. Neither Performance Fibers nor Morgan Lewis requested any other changes to the payment terms or the end-of-term options. TFG agreed to accept five of the eight requested changes.

On July 21, 2006, Mr. Field received the revised lease documents. Performance Fibers and TFG subsequently executed this version of the lease documents. The final executed documents include: Master Lease Agreement (Ex. 3); Lease Schedule No. 1 (Ex. 5); Bill of Sale (Ex. 6); Acceptance Certificate to Lease Schedule No. 1 (Ex. 8); Security Agreement (Ex. 4); Notice of Assignment (Ex. 7); Corporate Incumbency Certificate (Ex. 9); Guaranty (Ex. 10); and Performance Fibers Holdings, Inc. Written Consent of Directors (Ex. 11).

The Master Lease Agreement identified TFG-North Carolina, L.P. as the Lessor and

Performance Fibers, Inc. as the Lessee. (Ex. 3 at 1.) The Lease Schedule identified the property to be leased as "Implementation Costs associated with SAP Software as more fully described on the attached Exhibit A which by this reference is made a part hereof." (Ex. 5 ¶ 1.) The term of the lease was twenty-four months with a monthly rental of $144,257.86. The total cost of the lease was $3,215,018.05.

Paragraph 12 of the Lease Schedule reads:

For purposes of this Lease Schedule No. 1 only, Section 19(d) shall be deleted in its entirety and replaced with the following: Upon the completion of the Base Term of any Lease, Lessee shall, provided at least one hundred eighty (180) days' prior written notice is received by Lessor from Lessee via certified mail, elect one of the following options: (i) purchase all, but not less than all, of the Items of Equipment for a price to be agreed upon by Lessor and any applicable Assignee and Lessee, or (ii) extend the Lease for twelve (12) additional months at the rate specified on the respective Schedule, [sic] With respect to option (i), each party shall have the right in its absolute and sole discretion to accept or reject any terms of purchase or of any new Schedule, as applicable. In the event Lessor and Lessee have not agreed to option (i) by the end of the Base Term, <u>or if Lessee fails to give written notice of its election via certified mail at least one hundred eighty (180) days prior to the termination of the Base Term, then option (ii) shall automatically apply at the end of the Base Term.</u> At the conclusion of the extension period provided for in option (ii) above, the Lease shall continue in effect at the rate specified in the respective Schedule for successive periods of six (6) months, each subject to termination at the end of any such successive six-month renewal period by either Lessor or Lessee giving to the other party, at least one hundred eight (180) days prior to the end of such renewal period, written notice of termination.

(Id. ¶ 12 (emphasis added).)

In Paragraph 13, TFG and Performance Fibers "agree[d] that this Lease Schedule constitutes a 'finance lease' under the Uniform Commercial Code." (Id. ¶ 13.) Paragraph 19(a) of the Master Lease Agreement is an integration provision: "This Master Lease and all Schedules duly executed and attached hereto from time to time constitute the entire agreement

7

between the parties hereto with respect to the Equipment, and any change or modification hereto and any related agreement must be in writing and signed by the parties hereto." (Ex. 3 ¶ 19(a).)

Performance Fibers was required by Paragraph 9 of the Lease Schedule to "provide a Security Deposit in the amount of 40% [$1,286,007.22] of the Total Equipment Cost to be held in an instrument acceptable to Lessor at Republic Bank." (Ex. 5 ¶ 9.)

The Parties' Performance

After the parties executed the transaction documents, TFG sent $1,929,010.83 directly to Performance Fibers and placed $1,286,007.22 in an account with Republic Bank. The $1,286,007.22 was the 40% security deposit required by Paragraph 9 of the Lease Schedule. Performance Fibers executed a security agreement giving TFG a security interest in the security deposit. (Ex. 4.)

Each month, TFG sent Performance Fibers an invoice. Each invoice referred to the lease number. Performance Fibers made interim lease payments for July (partial), August and September 2006. Performance Fibers made twenty-one base term payments, ending in June 2008. Performance Fibers did not make the payments for July, August or September 2008. In total, Performance Fibers paid $3,592,020.71.

The 40% Deposit

Performance Fibers argues that when Performance Fibers gave TFG audited financial reports, TFG was obligated to return to Performance Fibers the money from the security deposit account at Republic Bank. Nothing in the transaction documents supports Performance Fibers' argument.

In an email dated June 29, 2006, Scott Wingate wrote to Trey Turley:

> Presumably they will have audited financials soon? This may be both good and bad. I am confident that they are performing well–but I'm still not so sure that he isn't going to expect the deposit to be released once they've given you these. I don't think we should address this though until we are done with the first deal.
>
> If the financials look great, then we can all see what makes sense at that time.

(Ex. H-7.)

When Mr. Turley was cross-examined about his understanding of the email, he testified that once TFG had received the audited financials, TFG would review them and "would look to release [the 40% deposit] in part or full." (Jan. 24 Tr. at 119-20.)

Later, after talking with Mr. Secrist, Mr. Turley told Mr. Field that the finance committee wanted to wait a few months and see how Performance Fibers performed before releasing the security deposit. (Ex. H-3.) Jordan Greenwell explained that when he received and reviewed Performance Fibers' interim financial statements, sometime in August 2006, "there was a deterioration in their operating numbers." (Jan. 25 Tr. at 345.) When he received the 2006 audited financial statements, he saw that these financials "validated that deterioration. . . . For the year they ended up posting a loss. . . . They also showed a significant increase in the debt of the company." (Id. at 346.) TFG did not return the security deposit.

The court finds that, at most, TFG and Performance Fibers discussed the possibility that TFG would return the security deposit, but TFG was not obligated to do so.

<u>The Parties' Intent</u>

1. <u>The parties intended that the transaction would be a lease.</u>

Although Performance Fibers now contends that the transaction with TFG was a loan, not a lease, Performance Fibers' actions before this dispute began do not support this argument.

The transaction documents themselves clearly state that Performance Fibers and TFG

9

were entering into a lease transaction. Performance Fibers signed the lease documents only after extensive consultation and suggestions from its attorneys. And even though those attorneys recognized that certain standard lease provisions in the documents were not necessary, neither the attorneys nor Performance Fibers told TFG that Performance Fibers would not enter into a lease agreement or that the transaction should be structured as a loan.

Performance Fibers treated the transaction as a lease on its books. Keith South, who at the time of the transaction was corporate controller for Performance Fibers, testified that when Mr. Field first notified him of the pending transaction, Mr. Field referred to the transaction in an email as "a loan agreement," and that Charles Jarvis, of Performance Fibers' accounting department, recommended that the "transaction be booked as a note payable." (Jan. 27 Tr. at 626.) Ultimately, however, Mr. South determined that Performance Fibers should book the transaction as a capital lease. Mr. South also testified that until the lawsuit began, he never had any discussions with anyone that the transaction was actually a loan.

Significantly, Performance Fibers reported the transaction to the IRS as a capital lease. Moreover, Performance Fibers represented in its audited financials that the transaction was a capital lease. Mark Larson, the Grant Thornton (Performance Fibers' independent auditor) audit partner who planned and supervised the work for Performance Fibers' audit, testified that Grant Thornton had tested the transaction and concluded that the transaction was a capital lease.

All TFG witnesses testified (not surprisingly) that they believed the transaction was a lease. And the evidence established that TFG did not do loans, only leases.

TFG called as an expert witness James Schallheim, a finance professor at the University of Utah. Dr. Schallheim is a financial economist with an expertise in leasing. According to Dr.

Schallheim, the software implementation costs involved in the TFG/Performance Fibers transaction were an asset that could be leased. Dr. Schallheim also opined that Performance Fibers treated the accounting for the software development and implementation costs as a capital asset, both before and after entering into the transaction with TFG. Finally, Dr. Schallheim's opinion was that Performance Fibers could not have obtained financing for less than the prime rate, which would have been the result if, in fact, the transaction was actually a loan requiring Performance Fibers to make twenty-four payments.

    2. <u>The parties intended that the end of term provisions would apply.</u>

    The end-of-term provisions were in the first draft letter of intent and in all subsequent documents. When the parties were reviewing and exchanging the draft lease documents, Performance Fibers' outside counsel requested that one of the original three end-of-term options be removed, that is, the option to return the leased property. Counsel did not ask that the other two end-of-term options -- the option to extend the lease or the option to purchase the property -- be removed. This action strongly suggests that Performance Fibers was well aware of the end-of-term options and recognized that these provisions would be part of the final agreement.

    Moreover, the end-of-term options gave Performance Fibers the benefit of a lower monthly payment. Jordan Greenwell, TFG's director of credit and syndication at the time of the transaction explained:

> Q. Why were the end-of-term options advisable from a structuring perspective?
>
> A. Well, primary -- primarily related to the lower monthly payment. The yield that we would receive on a transaction would consist of the payments during the base lease term as well as an end-of-term option. If there were no end-of-term option or say it was a dollar purchase lease, or if the lessee had an option to purchase the equipment at the end of the

> term for one dollar, then the monthly payment would need to be significantly higher because that would represent the entire obligation, all of the payments that they were to make, and we would need to make our yield out of just those payments.

(Jan. 25 Tr. at 331.)

### The End of the Transaction

Sometime in the spring or summer of 2008, Mike Alger, an employee of Sun Capital, called Mr. Seacrist. Mr. Alger asked Mr. Seacrist about the details of the Performance Fibers/TFG transactions. Mr. Seacrist, after reviewing the documents, called Mr. Alger and explained the terms of the transaction, including the payments, the date of maturity and the end-of-term options. Later, Mr. Alger and another person from Sun Capital, Mathew Garff, spoke again to Mr. Seacrist by telephone. In that conversation, Mr. Alger and Mr. Garff told Mr. Seacrist that "they felt that they had paid [TFG] an adequate amount, that [TFG] had made an adequate yield, and that they were not going to pay [TFG] anything further at that point." (Id. at 267.) Mr. Scharman also spoke to Mr. Alger and Mr. Garff. In that conversation, Mr. Alger and Mr. Garff reiterated their position that TFG had received enough yield on the transaction and that no further payments would be made.

In a letter dated June 5, 2008, Performance Fibers informed TFG that it had fully repaid its obligations to TFG and was "terminating its arrangements" with TFG. (Ex. 98.) Performance Fibers demanded that TFG return "the full amount of the Security Deposit." (Id.) TFG did not return any of the security deposit but instead instructed Republic Bank to apply the money in the account to Performance Fibers' obligations under the lease. Republic Bank did so on July 5, 2008.

The parties have stipulated that Performance Fibers did not give the written notice required by Paragraph 12 of the Lease Schedule (Ex. 5). Paragraph 12 provided that if no notice was given, the second end-of-term option, a twelve-month extension of the lease, would go into effect.

## CONCLUSIONS OF LAW

The court has diversity jurisdiction over this lawsuit because there is complete diversity among the parties and the amount in controversy exceeds $75,000. Venue is not disputed.

In its complaint, TFG brought three claims: (1) Breach of contract against Performance Fibers; (2) Breach of guaranty against Performance Fibers Holdings; and (3) Writ of Replevin for the return of the leased property. In response, Performance Fibers brought four counterclaims: (1) Declaratory judgment against all Counterclaim-Defendants that the Master Lease Agreement and related documents are unenforceable and that Performance Fibers owes no further obligation to TFG; (2) Breach of contract against all Counterclaim-Defendants; (3) Conversion against all Counterclaim-Defendants; and (4) Unjust enrichment against Tetra Financial Group. But in its proposed findings of fact and conclusions of law, TFG focused only on its claim for breach of contract. For that reason, the court will narrow its conclusions of law to that claim only.

In its order denying summary judgment, the court noted that questions remained whether the parties intended that the transaction was a loan or a lease and whether the end-of-term provisions would apply. (Dkt. No. 127.) As discussed above, the court has found that the parties intended that the transaction would be a lease and the end-of-term provisions would apply.

TFG argues that the court should conclude that the court can base its decision on the transaction documents alone, without resort to other evidence. Performance Fibers disagrees, contending that the documents are ambiguous and the court must look to the parties' intent. The court does not need to resolve that dispute because both the language of the documents and the extrinsic evidence support the conclusions that the parties viewed the transaction as a lease and that they intended that the end-of-term provisions apply.[2]

Utah law requires proof of four elements to establish a breach of contract claim: (1) the existence of a contract; (2) performance by the party seeking to recover; (3) breach of contract; and (4) damages. Eleopulos v. McFarland & Hullinger, LLC, 2006 UT App. 352, ¶ 10, 145 P.3d 1157. TFG has proved each of the four elements. First, the parties had an agreement. Second, TFG provided $3,215,018 in funding. Paragraph 9 of the Lease Schedule further required Performance Fibers to provide a security deposit of 40% of the funding amount "[a]s additional security for the financing provided." (Ex. 5 ¶ 9.) The parties have stipulated that TFG provided $1,929,010.80 directly to Performance Fibers and placed $1,286,007.20 in a security deposit account at Republic Bank. And, as discussed above, although the parties discussed the possibility that TFG would release the security deposit as soon as Performance Fibers delivered to TFG audited financial statements, regardless of what the audited financial statements revealed about Performance Fibers' financial condition, neither the language of the Lease Schedule nor

---

[2] Although it might be more accurate to describe Performance Fibers as willing to accept that the transaction be structured as a lease if that was a condition that TFG required to provide funding. In the words of Mr. Field, "My understanding was that this was a finance arrangement. If they wanted to call it a lease, they could call it a lease. If they wanted to call it a loan agreement, they could call it a loan agreement." (Ex. 204 at 141.) Significantly, when asked if Performance Fibers intended to honor the end of term options, Mr. Field answered, "Yes. We expected to abide by the agreement." (Id. at 188.)

the evidence support Performance Fibers' position.  TFG was under no obligation to release the security deposit.  Finally, Performance Fibers breached the agreement when it stopped making payments.  Performance Fibers Holdings also failed to make payments for these months, thereby breaching the guaranty.

TFG suffered damages as a result of Performance Fibers' breach.  Although Performance Fibers included its proposed damages in its pleading, the court believes that additional information is necessary. The parties have two weeks from the date of this order to submit simultaneous supplemental briefing on the issue of damages.

SO ORDERED this 23rd day of May, 2011.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
United States District Judge